UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOSE GONZALEZ,

                      Petitioner,

         -against-

SUPERINTENDENT WILLIAM LAPE,
      Coxsackie Correctional Facility,

                  Respondent.
-------------------------------------------------------x

**MEMORANDUM & ORDER**

09-CV-4021 (RJD)

DEARIE, Chief Judge.

      Following a jury trial at which he testified, petitioner Jose Gonzalez was convicted of attempted murder in the second degree and criminal possession of a weapon in the second degree, and sentenced to concurrent terms of seventeen and ten years respectively. The charges and conviction arose from the shooting of one Geraldo Pacheco on a Brooklyn street on the afternoon of July 9, 2002. On his present application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, his chief claim is that the admission at trial of two 911 telephone recordings violated his confrontation rights under Crawford v. Washington, 541 U.S. 36 (2004) and its progeny. He also claims that the prosecutor's summation deprived him of a fair trial and that trial counsel was constitutionally ineffective. For the reasons that follow, the application is denied and the petition is dismissed.

## BACKGROUND

**A.   The Prosecution's Case**

      The prosecution relied on testimony from the victim (Geraldo Pacheco), a child eyewitness (Niama Sims) and the responding officer (Daniel Venditti), as well as the recordings of two 911 telephone calls. No weapon was recovered.

Pacheco testified that he was walking down Lincoln Place, passing by the corner of Classon Avenue, when he encountered petitioner, whom he knew as a "friend," engaged in some construction work in a bodega. Petitioner looked toward Pacheco "in a bad way," which Pacheco attributed to a recent fight he (Pacheco) had had with another friend of petitioner's. Pacheco returned the look, words ensued, petitioner approached Pacheco, and the two men then exchanged a round of "about eight" punches. Believing he was the winner and that the fight was over, Pacheco put on his walkman and began walking away while petitioner withdrew into the bodega. But Pacheco then suddenly felt himself being shot in the arm. He turned around, saw petitioner holding a gun, tried to run, and petitioner shot him two more times, in the back and in the buttocks. Petitioner then returned to the bodega, while Pacheco collapsed on the street.

Pacheco was unarmed, and wearing a blue sweater and beige shorts, while petitioner was dressed in a red shirt and black shorts.

In custody himself at the time of petitioner's trial because of a burglary conviction, Pacheco encountered petitioner in the courthouse holding cell before trial. The trial court permitted Pacheco to testify that while in the cell, petitioner threatened to have him (Pacheco) jumped at Riker's Island and offered him $10,000 to drop the charges.

Twelve-year-old Niama Sims testified that while she was on Lincoln Place talking with friends she saw two men—one wearing a red shirt, the other blue—engaged in a fistfight across the street. She had never seen the blue-shirted man before but recognized the face of the red-shirted man from the neighborhood. It looked to her like the man in the blue shirt was winning the fight. Then the man in the red shirt retreated into a store, quickly emerged with a gun, and as the man in the blue shirt was walking away, shot him in the back. Sims remembered that the

gun was little and black but she did not think that she would be able to recognize the shooter if she saw him again.

Responding officer Daniel Venditti testified that as he approached the area he first saw a man in a red shirt—soon to be known to him as petitioner—walking on Lincoln Place and pointing behind and over his shoulder toward Franklin Avenue where Pacheco was collapsed on a stoop.   The red-shirted man did not appear to be armed.   Venditti went toward Pacheco and after speaking quickly with the several people gathered there, returned to his vehicle to pursue petitioner, whom he found in the bodega "hiding" underneath the counter area.   The bodega was searched but no weapon was found.

The jury also heard recordings of the following two 911 calls:[1]


**Call No. 1**:

    OPERATOR: Police operator 1740. Where's the
               emergency?

    CALLER: Yeah, seems like there's a shooting. I saw somebody shot
             somebody over here in Brooklyn.

    O:      What borough is this in?

    C:      Brooklyn.

    O:      Address?

    C:      It's on Lincoln Place and Classon Avenue.

    O:      Lincoln Place and Classon Avenue?

---

[1] Because the trial transcript does not contain a transcription of the recordings, the Court relies on the transcriptions made by appellate counsel and set forth in the brief she prepared on petitioner's behalf.   See Resp. Ex. B at 7.   Appellate counsel represents that her office prepared the transcriptions from a copy of the tape furnished to her by the Office of the District Attorney, who has not, in turn, made any objection to the transcript so produced.

C: Classon Avenue, yea. One guy in a blue top and a white bottom, white shorts, he got shot.

O: Someone got shot?

C: Yeah. And another guy - umm - in a red-

O: Do you know who shot him?

C: No, I just saw him in a red top. He ran. Like he fired and ran.

O: Okay, so the person that was shot, where is he now? He's laying on the ground?

C: Well, he got up and he's heading toward, um, Franklin and Lincoln Place.

O: So there's no one there?

C: Yea, there-

O: The person that's shot, where's he?

C: He's walking toward Franklin Ave. on Lincoln Place.

O: Who's walking?

C: The person who got shot. Okay?

O: And what is he wearing?

C: A blue top and sort of white shorts, white shorts. Okay.

O: You're saying he's wearing white shorts?

C: Yeah. White shorts.

O: You said he left and went toward Franklin Avenue? Is that correct? . .

C: What? Pardon me?

O: The person that got shot, you said left the location and went toward Franklin Ave?

C: [unintelligible] Yeah, on Lincoln Place walking toward Franklin.

O: And the person that shot him, was he black, white or Hispanic?
C: [unintelligible] . . . some distance away. I couldn't tell. He seemed to be light-skinned black or Hispanic, one of the two.

O:     Did you see what he was wearing, or no?  You said he was –

C:     Yeah . . . A reddish color shirt.

O:     Okay.  Would you like to leave your last name or your number?

C:     Well, you already got my number, baby. . . I'm already taking that chance, you
       know what I'm saying.  Alright, bye.

O:     Okay, sir?  Hello?


**Call No. 2**:

O:     Police operator.  Where is the emergency and what borough?

C:     Brooklyn.  Someone just got shot on Lincoln Place between Classon and Franklin.

O:     Lincoln?

C:     Yeah, Lincoln Place.  He's walking toward Franklin.  He got a light blue shirt on
       with beige shorts.

O:     Between Classon and Franklin?

C:     Classon and Franklin.

O:     Did you see the person who shot him?

C:     Um, he's on the corner.

O:     The person who shot him is on the corner?

C:     Yeah.

O:     He's white, black, Hispanic?

C:     Um, Hispanic

O:     What is he wearing?

C:     Um, red shirt.

O:     Is he light-skinned, dark-skinned? [background talk] Sir? Hello?

C:      He's light-skinned [background talk].

O:      What else is he wearing?

C:      Nothing. That's it.

O:      He's just wearing a red shirt?

C:      Yeah, the guy –

O:      He don't have no pants?

C:      Yes, he does.  He has beige shorts on with a light blue shirt.

O:      Okay.

C:      And he's bleeding from the back.

O:      Okay.  No, I'm talking about the one who shot him.  The one with the gun.
        What is he wearing?

C:      I don't know.  I don't know [background talk].

O:      Hello? Sir?

C:      Yeah?

O:      Sir? You don't know where the person is who shot him?

C:      No, the other guy's about to drop. Can you come?

O:      We'll be there as soon as possible, sir.  Do you want to leave your name
        and number? [call ends]


**B.    The Defense Case**

Petitioner testified.  On direct, petitioner stated that while he was working in a bodega on

Classon Avenue, he heard a shooting occur just outside; shortly thereafter, police entered the

bodega and arrested him.

Petitioner denied that he committed the shooting.  He also denied that he had a fight or disagreement with Pacheco on the day of the shooting or previously.  It was the owners of the bodega, according to petitioner, who had a problem with Pacheco because Pacheco sometimes slept in the store and once stole the cash register.

Petitioner admitted that he was wearing a red shirt at the time of the incident.

Cross-examination elicited additional and conflicting details from petitioner.  He admitted, for example, that he was having a conversation out on the street with Pacheco about an individual with whom Pacheco had previously had some trouble, and that the conversation then moved inside the bodega.  Petitioner maintained that he did not see but only heard the shooting, and that he did not exit the bodega after the shooting to see what had happened.  As the cross-examination continued, however, petitioner disclosed that he placed a call to the 911 operator after the shooting and, using his limited English, described what had happened.   After petitioner so testified but while he was still on the stand, the prosecution played the tape of a 911 call in which the speaker, a male, told the operator that while he was doing construction work on Lincoln Place a man appeared with a gun and shot him several times.  During the resumed cross-examination, petitioner denied that the voice on the call was his but admitted that he was the only construction worker at that location at that time.

Petitioner also admitted that following his arrest, he had conversations with police while in the back seat of the police car and again at the precinct, and that in one of these conversations he gave the police a different account than the one to which he had just testified; in pertinent part, he had told police that he actually was out on the street rather than inside the bodega when the shooting occurred, and that after hearing the shots he retreated into the bodega.

## C.    Rebuttal

To rebut petitioner's trial testimony, the prosecution introduced evidence of statements petitioner made to police shortly after his arrest.

Police Inspector Michael Marino testified about the conversation he had with petitioner, in English, while the two were seated in a police vehicle at the scene.  According to Marino, petitioner said that he "was working in a deli doing construction and that a man came in.  They had an argument.  The man pulled a gun.  They fought for the gun and the gun went off."  Marino could tell that English was not petitioner's first language but he understood "the meat" of what petitioner told him.

Police Detective John Muller then testified about the conversation he had with petitioner, in English, at the stationhouse.  Muller stated that he first read petitioner his Miranda rights, and that he witnessed petitioner initial the Miranda card to reflect his understanding of each right and then sign the waiver.  Petitioner then told Muller that at the time of the shooting, Pacheco had come to the bodega to ask petitioner about a man with whom Pacheco had previously had some difficulties, and that because petitioner had no information to offer, Pacheco struck him.  While petitioner was lying on the ground, his account to Muller continued, he heard shots being fired outside, then gathered a piece of wood and brick, ran to the street, and eventually to a telephone, where he called the 911 operator.

Muller testified that he wrote down petitioner's account and read it back to him; and that petitioner remarked that he could not write English very well and then signed the statement.  Muller observed that "[petitioner] has an accent but he is clearly understood and he clearly understood [Muller]."

The third and final rebuttal witness was Detective Angel Jimenez, who was fluent in Spanish and English and remained present during Muller's interrogation of petitioner in case any translating was required, but none was. Jimenez further testified that he saw petitioner sign the Miranda waiver, heard him deliver his account to Muller, and saw him sign the written version of that statement.

## DISCUSSION

## I.    THE CONFRONTATION CLAUSE CLAIM

### A.    Procedural Considerations

Respondent argues that the confrontation clause claim is procedurally barred from habeas review because it was not first raised in the trial court and because the Appellate Division expressly relied on this procedural shortcoming (*i.e.*, a failure to preserve) when declining to reach the claim on the merits. See People v. Gonzalez, 44 A.D. 3d 871, 872 (2d Dep't 2007) ("[petitioner's] contention that the admission of certain tape-recorded 911 calls into evidence violated his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution is unpreserved for appellate review," citing C.P.L. §470.05). [2] This Court agrees.

Although petitioner's confrontation clause claim was fully briefed in the Appellate Division, the brief also conceded that the constitutional issue was not preserved by appropriate objection in the trial court. See Resp. Ex. B at 27. While such a concession in an appellate brief is not necessarily dispositive, in petitioner's case it was appropriate. The record discloses that

_____

[2] Petitioner sought and was denied leave to appeal from the Appellate Division's order. See People v. Gonzalez, 9 N.Y.3d 1006 (2007).

what little discussion occurred with respect to the tapes' admissibility concerned only the "present sense impression" exception to the hearsay rule under state law, not the constitution, and that defense counsel remained silent, both when the prosecution first asked the trial court to rule on the tapes' admissibility, see Tr. Apr. 16, 2004, Resp. Ex A, Part II, at pp. 6-7, and when the court ruled several days later. See Tr. Apr. 21, 2004, Resp. Ex. A, Part III, at pp. 4. Although the court's brief oral ruling concludes with the phrase "[e]xception for the defense," id., any objection that the court's words might arguably have imputed to defense counsel could only have been hearsay-based, not constitutional, given the entirely hearsay-based context of the court's remarks.[3] See People v. Kello, 96 N.Y.2d 740, 743-44 (2001) (appellate claim that admission of 911 tapes at trial violated confrontation clause of the Sixth Amendment not properly before the court because objection at trial was based on state common-law hearsay rule); People v. Lopez, 25 A.D.3d 385, 386 (1st Dep't ) (hearsay-based trial objection to admission of nontestifying codefendant's statement did not preserve a confrontation clause claim for appeal; fact that trial occurred before Crawford decision issued "does not affect defendant's obligation to make a proper constitutional claim, as opposed to a claim grounded in state evidentiary law"), lv. app. denied, 7 N.Y.3d 758 (2006).

Notably, having determined that petitioner's constitutional claim was unpreserved, the Appellate Division declined to make an alternative finding on the merits. Id. The habeas consequences are clear: I may not consider the merits of the procedurally defaulted constitutional claim. See generally Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (claims are procedurally barred from habeas review if rejected in state court on independent and

---

[3] The trial court announced that after listening to the tapes it found that the calls "do represent present sense impressions as an exception to the hearsay rule" and that it would "allow the People to introduce the tapes as part of their direct case." Resp. Ex. A. Part III at p. 4.

adequate state-law procedural grounds); <u>Garvey v. Duncan</u>, 485 F.3d 709, 715-16 (2d Cir. 2007) (New York's contemporaneous objection rule is a "firmly established and regularly followed state law" and thus qualifies as "independent and adequate state law ground").

For the sake of habeas petitioners who often misunderstand their procedural obligations or the seemingly harsh results of procedural missteps, I reiterate here that, far from being a ceremonial elevation of form over substance, the "rule" in question reflects and affects matters as fundamental and paramount as the relations between federal and state government in our society. <u>See</u> <u>Coleman</u>, 501 U.S. at 732 ("In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.")

An exception exists: habeas review of a procedurally defaulted constitutional claim is permissible when a petitioner demonstrates "cause" for the default and resulting "actual prejudice." [4] <u>Coleman</u>, 501 U.S. at 748-50. A viable (and the usual) route to showing the requisite cause and prejudice is to claim that counsel was ineffective in failing to preserve the procedurally defaulted constitutional claim. <u>See</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451-52 (2000). Petitioner makes such a claim here. Of course, "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim" that must, in turn, satisfy the rigorous procedural requirements

_____

[4] Additionally, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986). Petitioner's assertion of innocence, however, is frivolous.

and substantive standards applicable to any claim advanced as a basis for habeas relief.

Edwards, 529 U.S. at 451 (emphases in original).

Procedurally, petitioner's default-excusing ineffectiveness claim arrives in the relatively unusual position of having been actually presented in the state court but not ruled upon. Specifically, the *default-excusing branch* of petitioner's multi-branched ineffectiveness claim appears plainly on page 27 of his principal appellate brief.  See Petitioner's App. Brief, Resp. Ex. B, at p. 27.  Having conceded that trial counsel had failed to preserve the confrontation clause claim, the brief asks the Appellate Division to reach the issue upon a finding that trial counsel was ineffective for failing to make the appropriate objection in the trial court.  Id.  The brief cites Strickland v. Washington, 466 U.S. 668 (1984) and argues that trial counsel's failure to raise Crawford was defective performance because it had been handed down only a month before the trial court was asked to rule on the 911 tapes' admissibility and was, in counsel's view, "*the* hot topic in the criminal law field."  Id.  (emphasis in original).   Respondent squarely opposed the claim that trial counsel was ineffective for failing to object to the admission of the 911 tapes. See Respondent's App. Br., Ex. C, at pp. 23-25.   Nowhere within the Appellate Division's decision, however, do I find language that may reasonably be read as a judicial ruling on the claim.  See Gonzalez, 44 A.D.3d at 871.  The decision does refer to and rule upon the *other* branches of petitioner's ineffectiveness claim, but not the default-excusing portion.  Id.[5]

---

[5]  The decision states that "[petitioner's] remaining contention, raised in his supplemental pro se brief, that he was deprived of the effective assistance of counsel is based, in part, on matter dehors the record, which cannot be reviewed on direct appeal," and that, "[t]o the extent that [the court is] able to review those claims, [petitioner] received the effective assistance of counsel."  Gonzalez, 44 A.D.3d at 871.  Notably, the decision does not employ language of a wider embrace—such as a reference to petitioner's "remaining contention*s, including those* raised in the supplemental brief"—but instead addresses *only* the ineffectiveness grounds raised in the supplemental brief.  And in *that* submission, petitioner raised each of the *other* branches of his ineffectiveness claim (i.e., that counsel failed to seek to locate the 911 callers, and that

The question that arises, therefore, is whether the apparent lack of an appellate ruling renders an actually presented claim unexhausted. The Supreme Court has spoken to the question on several occasions, each time resolving the matter in favor of the habeas petitioner. See Smith v. Digmon, 434 U.S. 332, 333 (1978) (*per curiam*) ("It is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court, and, indeed, in this case, vigorously opposed in the State's brief"); Castille v. Peoples, 489 U.S. 346, 351 (1989)

---

counsel failed to secure a handwriting expert to challenge the signature on his Miranda waiver and statement), but not the failure-to-preserve component.

To be sure, a "blanket statement" by the Appellate Division, even when in the disjunctive, is regarded as an "adjudication on the merits" for section 2254(d) purposes. See Ryan v. Miller, 303 F.3d 231, 245-46 (2d Cir. 2002) ("blanket statement" that a defendant's "remaining claims are without merit" or "are either unpreserved or without merit" count as adjudications on the merits triggering AEDPA deference). Likewise, we habeas courts undertake the deferential substantive review required by AEDPA regardless of whether the state court decision cites pertinent case law or even a rationale. See Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) (although "a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests . . . the absence of an explanation does not absolve us from performing the same task"). See also Coleman, 501 U.S. at 79 ("we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim"). Nonetheless, a habeas court may not "fill in" an absent state court *disposition*. See Ryan, 303 F.3d at 246 ("A state court need not analyze each individual claim or cite federal law in order to adjudicate a claim, *so long as it states it is disposing of the claim*) (emphasis added).

I therefore reject the inviting possibility here—namely, to read into the Appellate Division's determination that the confrontation clause claim is unpreserved an implicit rejection of the reasons offered to excuse the failure to preserve. Petitioner's appellate brief advanced trial counsel's ineffectiveness as one of two distinct, alternative grounds for appellate review of the unpreserved claim, the other ground being the exercise of the court's interest of justice jurisdiction under C.P.L. § 470.15; and the Appellate Division's decision, while silent on (this branch of) ineffectiveness, *does* address (and reject) the section 470.15 invitation. See Gonzalez, 44 A.D. 3d at 871 ("We decline to review [the unpreserved claims] in the exercise of our interest of justice jurisdiction").

(reads <u>Digmon</u> as "inferring" an "exception" to the exhaustion requirement "where the claim has been presented as of right but ignored (and therefore impliedly rejected)"); <u>Dye v. Hofbauer</u>, 546 U.S. 1, 3 (2005) (*per curiam*) ("Failure of a state appellate court to mention a federal claim does not mean the claim was not presented to it," citing <u>Digmon</u>).[6]  On the basis of these authorities  I conclude that petitioner's default-excusing ineffectiveness claim is exhausted.

A federal habeas court faced with such undecided claim should, however, first try to eliminate the possibility that the claim was raised in the wrong forum or pleading and ignored for that reason.  <u>See</u>, <u>e.g.</u>, <u>Seifert v. Keane</u>, 74 F. Supp. 2d 199, 204 (E.D.N.Y. 1999) (before concluding, under the reasoning of <u>Digmon</u> and <u>Castille</u>, that a fairly-presented but un-ruled-upon ineffectiveness claim was exhausted, Judge Ross first determined that the claim was "raised . . . to the proper court" and "through the proper procedural vehicle"), <u>aff'd</u>, 205 F.3d 1324 (2d Cir. 2000).  I conclude that it was proper for petitioner's unruled-upon claim to have been raised in the principal brief on direct appeal.  Although New York law requires that ineffective assistance of trial counsel claims involving matters outside the record be brought by post-conviction motion in the trial court, <u>see</u> C.P.L. § 440, the default-excusing branch of petitioner's ineffectiveness claim is based entirely *on* the record.  Ineffectiveness claims asserting such failures-to-object-and-preserve are routinely raised on direct appeal.  <u>See</u>, <u>e.g.</u>, <u>People v. Cass</u>, 2010 WL 5020880, *1 (2d Dep't Dec. 7, 2010) (citing additional authorities).

---

[6] On the subject of exhaustion, I further note that petitioner also raised this branch of his ineffectiveness claim (i.e., that counsel was ineffective for failing to preserve the confrontation clause claim) in the papers supporting his application for leave to appeal from the Appellate Division's decision. <u>See</u> Objection to Respondent's Reply to Defendant's Application for Leave to Appeal, Ex. H, at p. 4.

**B.**     *De Novo* **Consideration of Petitioner's**
          **Default-Excusing Ineffectiveness Claim**

Under Strickland, to establish that counsel was ineffective, petitioner

> must show that counsel's performance was deficient. This requires
> showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that
> counsel's errors were so serious as to deprive the defendant of a
> fair trial, a trial whose result is reliable. Unless a defendant makes
> both showings, it cannot be said that the conviction ... resulted
> from a breakdown in the adversary process that renders the result
> unreliable.

466 U.S. at 687.

The critical inquiry under the performance prong is "whether counsel's assistance was

reasonable considering all the circumstances." Strickland, 466 U.S. at 688.  To establish

prejudice petitioner must do more than merely show that the challenged conduct of counsel had

"some conceivable effect" on the trial's outcome.  Id., 466 U.S. at 693.  Instead, he must show "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  Id. at 694.   A "reasonable probability" is "a probability sufficient to

undermine confidence in the outcome."  Id.

Finally, Strickland teaches that "a court need not determine whether counsel's

performance was deficient before examining the prejudice suffered by the defendant as a result

of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground

of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

Id.

I conclude that petitioner did not suffer Strickland prejudice as a result of trial counsel's

failure to make a Confrontation Clause objection to the admission of the 911 tapes because the

admission of the tapes did not violate petitioner' confrontation rights and so the objection would not have had merit.  In Crawford, the Supreme Court held that the confrontation clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  541 U.S. at 53-54.  Two years later, in Davis v. Washington, 547 U.S. 813 (2006), the Court was asked to consider whether the statements made or elicited during a 911 call are "testimonial" within the meaning of Crawford.  The Court announced the following test:

> [s]tatements are not testimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an *ongoing emergency*.  They are testimonial when the circumstances indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822 (emphases added).[7]

Because the test refers to an "ongoing *emergency*" rather than an "ongoing *crime*," statements made to a 911 operator are "ordinarily" not testimonial because the call "is ordinarily not designed primarily to establish or prove some past fact but to describe current circumstances requiring police assistance."  Id., at 827 (internal quotations and bracketing omitted).  Indeed, in a fact-intensive discussion that recognizes the possibility "that a conversation which begins as an interrogation to determine  the need for emergency assistance . . . [might] evolve into testimonial statements once that purpose has been achieved," id. at 828 (internal quotations omitted), the Court's analytical keynote is the emergency: "[e]licited [911] statements" are not testimonial, the Court teaches, when they are "necessary to be able to *resolve* the present emergency rather than simply to learn (as in Crawford) what had happened in the past."  Davis, 547 U.S. at 827

---

[7] The Court "assum[ed] without deciding" that 911 operators are "agents of law enforcement when they conduct interrogations of 911 callers."  Davis, 547 U.S. at 823, n. 2.

(emphasis in original). "This is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." Id. Accord, United States v. Burden, 600 F.3d 204, 225 (2d Cir. 2010) (Circuit concludes, after in-depth examination of Crawford and Davis, that the "broader significance" of Davis is that "the declarant's purpose in speaking matters;" court identifies, as the "dispositive distinction" between the statements held to be testimonial in Crawford and those held to be nontestimonial in Davis, the fact that "the *purpose* of [the latter speaker] had not been to testify but to enable police assistance to meet an ongoing emergency") (emphasis in original) (internal quotation and citation omitted), cert. denied, __ U.S. __, 131 S. Ct. 251 (2010).

Applying Davis to the two 911 colloquies admitted at petitioner's trial, I readily conclude that the "primary purpose" of the speaker in each call was to assist the police in "resolving" an "ongoing emergency." Each caller advised the 911 operator that a shooting had "just" occurred and, in response to the operator's questions, described the man believed to be the shooter as Hispanic and dressed in a red shirt; the speaker in the second of the two calls also emphasized the victim's urgent need for assistance. Obviously, the *emergency* (and thus the need for police assistance) was "ongoing" within the meaning of Davis: the victim of a shooting was bleeding on the street while the shooter was beginning his flight. See Davis, 547 U.S. at 827 ("[e]licited [911] statements" are not testimonial when "necessary to be able to *resolve* the present emergency . . . This is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon"). See also United States v. Thomas, 453 F.3d 838, 844 (7th Cir. 2006) (anonymous 911 caller's statement that "there's a dude that just got shot" and that "the guy who shot him is still out there" held to be nontestimonial under Davis; fact of "ongoing emergency" is "evidenced by the

-17-

operator's repeatedly questioning the caller to determine who had the gun and where [the victim] lay injured"); Williams v. LaClair, 08 CV 11354, 2010 WL 129810, *7 (S.D.N.Y. Jan. 13, 2010) (911 call "made immediately after a shocking event and without time for consideration" held to be nontestimonial under Davis; "[i]t is clear that the primary purpose of the operator and the caller was to address an ongoing emergency" because "two people were brandishing guns inside an apartment building"); Coleman v. Squilliante, 06 CV 13518, 2008 WL 4452351, *9 (S.D.N.Y. Oct. 2, 2008) (statements made by unidentified bystander in 911 call were "clearly nontestimonial;" caller "described events either as they were occurring or right after" and "emphasized that victims were 'bleeding real bad'"); Mitchell v. Poole, 08 CV 615, 2008 WL 2795469, *1 (E.D.N.Y. July 18, 2006) (911 call of robbery witness "had all the earmarks of non-testimonial statements" under Davis where, *inter alia*, she "called 911 as [the crime] was happening or immediately thereafter, describing the particulars of the perpetrator and the location of the robbery in an agitated state").

The admission of the two 911 calls at petitioner's trial, therefore, did not violate his rights under the Confrontation Clause.

Additionally, even if one or both of the 911 conversations "evolve[d] into [the] testimonial," Davis, 547 U.S. at 828 (internal citation omitted), I would conclude that the admission of any such testimonial portions was harmless. Violations of the Confrontation Clause are subject to harmless error analysis, Kotler v. Woods, 620 F. Supp. 2d 366, 394 (E.D.N.Y. 2009) (collecting cases), and in a federal habeas proceeding, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States,

328 U.S. 750, 776 (1946)).[8] The admitted 911 tapes could not have had such an effect in petitioner's case because there was substantial independent evidence of petitioner's guilt, including: the testimony of the victim, who had some relationship with petitioner before the shooting and thus a basis for making his identification; the testimony of a disinterested eyewitness who corroborated much of the victim's account of the shooting; the responding officer's testimony, which corroborated certain aspects of the accounts of the victim and the eyewitness; the victim's testimony about petitioner's efforts to bribe and threaten him in the courthouse pens just before trial; and the series of inconsistency-riddled accounts of the shooting that petitioner himself delivered to police and while on the stand.

For all these reasons, petitioner was not "prejudiced" within the meaning of Strickland by his trial counsel's failure to preserve a confrontation clause claim, and he has therefore failed to establish the requisite "prejudice" necessary to permit me to bypass the procedural default and consider the Confrontation Clause on the merits. In any event, even if the confrontation claim were not procedurally barred, I would deny it on the merits for the reasons just discussed.

In sum, petitioner is not entitled to any habeas relief on the basis of the admission of the 911 tapes at his trial.


II.     THE REMAINING ALLEGATIONS OF INEFFECTIVENESS

The petition and supporting papers, liberally construed, appear to advance three additional ways in which trial counsel allegedly rendered constitutionally ineffective assistance.

---

[8] See generally Fry v. Pliler, 551 U.S. 112, 121 (2007) (holding that in § 2254 proceeding, court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness").

First, petitioner claims that "the two eyewitnesses who have no benefit in the case (the two 911 callers) were not interviewed" and that "at the very least no attempts were made to locate [them] to secure affidavits" ("Ground One"). Pet. at p. 17. Second, petitioner complains that counsel did not object to the admission of the signed Miranda waiver and his signed written statement on the ground that these were copies rather than originals ("Ground Two"). Pet. at pp. 17, 19. Third, petitioner claims that counsel should have secured a handwriting expert to dispute the authenticity of his signature on those documents ("Ground Three"). Pet. at pp. 17-20.

Petitioner satisfied the exhaustion requirement with respect to Grounds One and Three, having raised them in the pro se supplemental brief submitted to the Appellate Division on his direct appeal and then again in the trial court in a motion for post-conviction relief pursuant to C.P.L. § 440.10. Ground Two, however, was not presented to any court before being raised in the habeas petition, and because it is an on-the-record claim that petitioner should have raised on direct appeal, it is now procedurally defaulted. See Aparcio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001) ("when 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted") (quoting Coleman, 501 U.S. at 735 n. 1). Petitioner has not sought to excuse the default through a showing of cause and prejudice, nor could he. First, the record shows that counsel *did* make a general objection to the admission of the waiver and statement, and the context makes it clear that the basis for the objection was that the documents were not originals. See Tr. Apr. 26, 2004, Resp. Ex A, Part VI, at pp. 187, 188, 192. Second, Detective Muller testified that the two copies (of the Miranda warnings and of the written statement) were

exact duplicates of the originals, id. at 187-88, 191, and there was no other testimony disputing their authenticity as copies.

As for Grounds One and Three, both the Appellate Division and the 440 court rejected them. The Appellate Division determined that these grounds were "based, in part, on matter dehors the record, which cannot be reviewed on direct appeal," but further concluded that "[t]o the extent that [the court is] able to review those claims, [petitioner] received the effective assistance of counsel." Gonzalez, 44 A.D.3d at 871. The 440 court's decision largely relies on the Appellate Division's ruling. See People v. Gonzalez, Ind. No. 4555/02, Decision & Order dated June 5, 2008 ("The Appellate Division has reviewed these claims and found that they are without merit. Specifically, [petitioner] failed to show that in the totality of circumstances he was deprived of [ ]effective assistance of counsel … It was also pointed out that defense counsel apparently exercised good professional judgment in his trial tactics and decisions as to call certain witnesses").

The state court decisions are adjudications on the merits for AEDPA purposes, see, e.g., Ryan, 303 F.3d at 245-46, so the sole question is whether they are "contrary to, or involve[] an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

The answer is no.

The controlling Supreme Court authority of course is Strickland, and once again confining my analysis to the prejudice prong, I readily conclude that the state courts' rejection of Grounds One and Three are not contrary to or an unreasonable application of Strickland. With respect to Ground One, petitioner makes the following declaration: "as I have claimed throughout my challenges to my conviction . . . the two 911 callers would be able to provide

testimony that I was not the shooter." Reply to Aff. in Opp. at p. 4. Despite the several

opportunities petitioner has had to advance particulars in support of this bald assertion, however,

he has not done so, and Strickland prejudice cannot be established by mere speculation. See

Strickland, 466 U.S. at 693, 694 ("*some conceivable effect*" on the trial's outcome is insufficient;

there must be a "*reasonable probability* that, but for counsel's unprofessional errors, the result of

the proceeding would have been different") (emphases added).

With respect to Ground Three, which alleges that counsel should have secured a

handwriting expert to dispute the authenticity of petitioner's signature on the Miranda waiver

and written statement, petitioner once again fails to establish that the alleged shortcoming of

counsel affected the result of his trial. Indeed, in the face of the straightforward police testimony

about the questioning of petitioner at the precinct, this branch of petitioner's claim is frivolous.[9]

## III. PROSECUTORIAL MISCONDUCT

Petitioner claims that certain portions of the prosecutor's summation deprived him of his

constitutional right to a fair trial. He complains, *inter alia*, that the prosecutor vouched for the

strength of her case, expressed her personal belief in petitioner's guilt, misrepresented his

---

[9] This branch of petitioner's claim echoes his trial testimony on the subject, see Tr. Apr. 26, 2004, Resp. Ex. A, Part VI, at pp. 162-166, which carries the same unmistakable ring of incredulity as petitioner's testimony regarding the shooting. The following is a representative excerpt:

Q. Do you remember putting your signature on that piece of paper?
A. Nope. That is my signature, but I don't remember when I put it there. . . .
Q. You never signed it, but it is your signature, correct?
A. Exactly. I don't know how it got there.

Id. at p. 165.

defense, and suggested that the jury would have to find that all the witnesses lied in order to acquit. Petitioner raised this claim on his direct appeal, where the Appellate Division rejected it as "unpreserved for appellate review." Gonzalez, 44 A.D.3d at 871. The Appellate Division declined to review the contention in the exercise of its interest of justice jurisdiction or to make an alternative finding on the merits. Id. The claim is therefore procedurally barred. See Coleman, 501 U.S. at 729-30 (claim that is rejected in state court on adequate and independent state law ground is procedurally barred from review on habeas). Petitioner attempts to demonstrate cause and prejudice to excuse this default by arguing, in his habeas petition and supporting affidavit, that trial counsel was ineffective for failing to object to the prosecutor's summation. But *this* ground of ineffectiveness was *not* previously raised in state court (where, like the assertion that counsel failed to make other objections, it should have been raised on direct appeal), and so *this* default-excusing ground of ineffectiveness is itself procedurally barred. The Supreme Court in Edwards makes clear that claims of ineffective assistance asserted as cause are not "uniquely immune from the procedural-default rule that accompanies the exhaustion requirement in all other contexts." 529 U.S. at 452. Although the procedural default of an ineffective assistance of counsel claim asserted as cause and prejudice for the procedural default of another claim "may . . . *itself* be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that* claim," id. at 453 (emphasis in original), petitioner does not even embark upon that speculative journey. As I understand Edwards, petitioner's prosecutorial misconduct claim is now decidedly beyond the reach of a federal habeas court.

## CONCLUSION

For the foregoing reasons, the application for a writ of habeas corpus is denied and the petition is dismissed.  Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith.  <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).  The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      January 21, 2011

s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge